NO. 07-08-0047-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

NOVEMBER 13, 2008
______________________________

PASCUAL DELGADO, 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellant

v.

THE STATE OF TEXAS, 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellee
_________________________________

FROM THE 222ND DISTRICT COURT OF DEAF SMITH COUNTY;

NO. CR-07E-087; HON. ROLAND SAUL, PRESIDING
_______________________________

Memorandum Opinion
_________________________________

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.
Â Â Â Â Â Â Â Â Â Â Pascual Delgado (appellant) appeals his conviction for delivery of a controlled
substance. After pleading guilty before a jury, a trial was held on punishment. The jury
assessed punishment at 99 years imprisonment. The trial court sentenced appellant in
accordance with the verdict. Thereafter, he timely noticed his appeal, and counsel
represented appellant pro bono due to appellantâs indigence. The latter has moved to
withdraw after filing a brief pursuant to Anders v. California, 386 U.S. 738, 87 S.Ct. 1396,
18 L.Ed.2d 493 (1967), and representing that he searched the record and found no
arguable grounds for reversal. Counsel further represents that he informed his client of his
right to review the record and file a pro se brief or response. We also informed appellant
that any response he cared to file had to be filed by November 3, 2008. To date, appellant
has neither filed a pro se response nor moved for an extension of the November 3rd
deadline. 
Â Â Â Â Â Â Â Â Â Â We now address the validity of the two potentially arguable issues raised by
appointed counsel. The first involved the guilt/innocence phase. Counsel reviewed each
phase of the trial including 1) the indictment, 2) pre-trial motions, 3) appellantâs plea of
guilty and the trial court admonishments, and 4) the trial itself. As counsel points out, the
guilty plea before the jury âadmits the existence of all facts necessary to establish guilt.â 
Â Â Â Â Â Â Â Â Â Â The second issue concerned any error that may have occurred in the punishment
phase. According to counsel, the punishment may appear to be excessive, 99 years in
prison and a $250,000 fine; yet, it was still within the range prescribed by statute.
Therefore, counsel concludes that no error existed warranting reversal in either the
guilt/innocence or punishment phases.Â Â Â  Â 
Â Â Â Â Â Â Â Â Â Â We also conducted our own review of the record pursuant to Stafford v. State, 813
S.W.2d 503 (Tex. Crim. App. 1991) and found no arguable issue warranting reversal.
Â Â Â Â Â Â Â Â Â Â Accordingly, counsel's motion to withdraw is granted, and the judgment of the trial
court is affirmed. Â 
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Brian Quinn
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Chief Justice

Do not publish. 



ned statutory liability of all
defendants is not exceeded. Id. Further, the cap applicable to a single defendant who is
jointly and severally liable in a comparative negligence situation is not increased by the
number of culpable defendants. Columbia Hosp. Corp. of Houston v. Moore, 43 S.W.3d
553, 556 (Tex.App.--Houston [1st Dist.] 2001, pet. granted).

 Conversely, appellees argue in response to this issue and also in their first cross-issue that, because the five general partners of the owner and operator of the nursing
home have admitted they are not health care providers, they are not entitled to the
protection of the cap. Alternatively, even if the cap is available to all of the defendants,
there are six culpable defendants against whom the court has rendered judgment, and
therefore the cap should be multiplied by six. This is so, appellees posit, because it is not
necessary for the defendant to have been found liable by a jury for a defendant to be
culpable pursuant to the judgment.

 Only the issue of Cresthaven's negligence was submitted to the jury. However, the
judgment recites that appellees may recover jointly and severally from Cresthaven, Cantex,
and the five general partners of Cantex. While appellees assert that Cantex is liable
because it is the owner and operator of Cresthaven, they do not contend that both Cantex
and Cresthaven are culpable defendants, even though the jury found Cresthaven to be
negligent and judgment was rendered against both parties. Therefore, appellees 
apparently recognize that Cresthaven and Cantex are not two separate legal entities, and
Cantex is responsible for the liabilities of Cresthaven because Cantex did business as
Cresthaven. 

 As noted, appellees did not seek recovery against the general partners in their
pleadings as joint tortfeasors, and no issue as to the negligence of the general partners
was submitted to the jury. Therefore, even if the general partners have judicially admitted
that they are not health care providers, as appellees contend, it is irrelevant since
appellees did not seek damages from the general partners on the basis that they were
health care providers. The basis upon which appellees sought damages against the
general partners, and upon which the judgment against them was entered, is that statutory
law imposes joint and several liability on general partners for the debts and obligations of
a partnership making them vicariously liable. Tex. Rev. Civ. Stat. Ann. art. 6132b-3.04.
Vicarious liability is a judicially created vehicle for enforcing remedies for wrongs. Dutcher
v. Owens, 647 S.W.2d 948, 950-51 (Tex. 1983). It is the imposition of liability on one party
for the actionable conduct of another based on a relationship between the parties. Black's
Law Dictionary 1566 (6th ed. 1990). No liability under the law was imposed on the general
partners independent of their status as a partner. 

 Therefore, the general partners can only be liable for the debt incurred by Cantex
d/b/a Cresthaven. It is appropriate to include them in the judgment, but not to increase the
amount of the judgment by treating each general partner as a tortfeasor in its own right. 
We believe this interpretation is consistent with the stated purposes of the Medical Liability
and Insurance Improvement Act, one of which is to decrease the cost of claims and assure
that awards are rationally related to actual damages. See Tex. Rev. Civ. Stat. Ann. art.
4590i § 1.02(b)(2) (Vernon Supp. 1999). Otherwise, the amount of an award against a
health care provider could be doubled simply by the fact it has four general partners
instead of two. Thus, the judgment is limited by a single cap of $500,000 adjusted by the
consumer price index. 

 Appellants also contend that prejudgment interest is included within the section
11.02 cap on damages. This question has not been definitively answered by the Texas
Supreme Court. In Auld, the court concluded that prejudgment interest under the general
prejudgment interest statute (3) was included in the damages cap. Auld, 34 S.W.3d at 900-01. However, the majority opinion specifically declined to address whether sections 16.01
and 16.02 of article 4590i, added in 1995, conflict with this interpretation. Pursuant to
section 16.02, judgments must include prejudgment interest on past damages found by the
trier of fact, but are not to include prejudgment interest on future damages. Tex. Rev. Civ.
Stat. Ann. art. 4590i Â§ 16.02(b) (Vernon Supp. 1999). Nevertheless, in a concurring and
dissenting opinion, four justices indicated their belief that this section confirms that
prejudgment interest is not subject to the cap. Auld, 34 S.W.3d at 908. More recently, the
Houston Court of Appeals ruled that the majority opinion in Auld with respect to
prejudgment interest under the general statute was not binding when prejudgment interest
was awarded under the more recent provisions of the Medical Liability and Insurance
Improvement Act, which shows a legislative intent to exclude prejudgment interest from the
cap. Moore, 43 S.W.3d at 562. 

 We agree with the Houston court that the holding in Auld is not binding, and we
must determine the effect of the legislature having added Subchapter P dealing with
prejudgment interest to the act and reconcile it with the liability limits in Subchapter K. We
note initially that section 11.02 of Subchapter K states that where final judgment is
rendered against a physician or health care provider, "the limit of civil liability for damages
of the physician or health care provider shall be limited to an amount not to exceed
$500,000." Thus, the cap applies to damages, not the amount of the judgment. Further,
the cap does not include the amount of damages awarded on claims for necessary
medical, hospital, and custodial care. Tex. Rev. Civ. Stat. Ann. Â§ 11.02(b) (Vernon Supp.
1999). However, in Subchapter P, section 16.02 provides that the judgment must include
prejudgment interest on past damages, but shall not include prejudgment interest on future
damages. Id. Â§ 16.02(b). Thus, it seems clear that the legislature intended to make a
distinction between damages awarded and the final judgment by providing that the cap
applies to the damages awarded, but prejudgment interest on past damages must be
included in the judgment. Further, if the legislature had intended the cap to apply to
prejudgment interest, it would surely have made that provision. We believe this is a logical
interpretation of the act relying on the language used in the act. Thus, we find that
prejudgment interest is not included in the statutory cap on damages.

 We must next determine whether prejudgment interest is calculated on the capped
or uncapped amount of damages. The statute provides that prejudgment interest shall be
paid on past damages found by the trier of fact, but not on future damages. Past damages
are defined as those awarded to compensate the claimant for their loss incurred from the
period beginning on the date of injury and ending on the day before the date of judgment. 
Id. Â§ 16.02(d)(1).

 Appellees contend that, because the statutory language provides that prejudgment
interest is to be paid on damages found "by the trier of fact," prejudgment interest should
be calculated on that amount awarded before application of the damages cap and cite to
Moore in support of that proposition. However, the court held that prejudgment interest
is not included in the damages cap and is recoverable on all damages. Moore, 43 S.W.3d
at 562. However, that statement was, as noted, made within the context of whether
prejudgment interest was included within the cap. Therefore, the court was merely stating
that prejudgment interest is owed, even though it exceeds the amount authorized by the
damages cap and should be paid on all damages, both those covered and not covered by
the cap, i.e., medical, hospital, and custodial care.

 The issue in the other two cases cited by appellees, Samples v. Graham, 76
S.W.3d 615 (Tex.App.--Corpus Christi, 2002, no pet. h.) and Battaglia v. Alexander, No.
14-00-00428-CV, slip op., 2002 WL 730530 (Tex.App.--Houston [14th Dist.] April 25, 2002,
no pet. h.), was whether prejudgment interest should be awarded on past damages found
by the trier of fact prior to a deduction for settlement credits. In both cases, the courts
found that the deduction for settlement credits should be made after calculation of
prejudgment interest on the amount awarded by the jury. However, we note that in
Graham, the court stated that prejudgment interest is included in the statutory cap and
refused to find that "allowing prevailing plaintiffs to recover prejudgment interest only on
a statutorily limited measure of past damages found by the jury presents an absurd
scenario." (Emphasis added). Graham, 76 S.W.3d at 621.

 Nevertheless, we must assume the legislature intended the plain meaning of its
words and, if possible, ascertain their intent from the language used in the statute. National
Liability & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527 (Tex. 2000). The legislature did not
provide that prejudgment interest is to be awarded on the amount of past damages
included in the judgment, but on the amount awarded by the trier of fact. This language
implies that prejudgment interest is applicable on the full amount of past damages found
by the jury prior to the application of the liability cap, which determines the amount for
which the defendant is liable in the judgment. We therefore interpret the statute to require
calculation of prejudgment interest on the amount of damages found by the jury.

 In light of that finding, appellants argue that appellees are limited to prejudgment
interest on the amount of damages awarded by the jury for the survival claims because
appellees did not request segregation of past and future damages with respect to their
wrongful death claims. Appellants and appellees agree that the amount awarded as
survival damages constitutes past damages. Essentially, the only disputed issue between
the parties is which of them had the burden of requesting segregation of the wrongful
death damages. Appellants argue that, under the law, the burden is on the plaintiff. 
Conversely, appellees argue that, because appellants pled the statutory limitation on
prejudgment interest as an affirmative defense, they had the burden to request
segregation. 

 The statute clearly provides that prejudgment interest is not to be awarded on future
damages. Appellees have cited no authority stating that to be entitled to the benefit of this
statute, a defendant must assert it as an affirmative defense in his pleading. However, it
has been held that the burden of segregating past and future damages is on the party
seeking to obtain prejudgment interest. Cavnar v. Quality Control Parking, Inc., 696
S.W.2d 549, 556 (Tex. 1985); Domingues v. City of San Antonio, 985 S.W.2d 505, 511
(Tex.App.--San Antonio 1998, pet. denied). This is so because it is fair to place the
burden of submitting a proper jury charge on the party to whom the benefit of the charge
will result. Id. Because appellees did not submit a charge segregating past damages from
future damages, no prejudgment interest is available on the wrongful death damages
awarded.

 Finally, appellants contend with respect to prejudgment interest that the award
should be reduced for periods of delay caused by appellees. Prejudgment interest is to
be computed in accordance with the Texas Finance Code. See Tex. Rev. Civ. Stat Ann.
Â§ 16.02(c) (Vernon Supp. 1999). Under section 304.108(a), a court may consider the
periods of delay in the trial and order that prejudgment interest does not accrue during
them. Tex. Fin. Code Ann. Â§ 304.108 (Vernon Supp. 2003). However, prejudgment
interest is to be denied only for delays caused by the parties and not a crowded trial
docket. Purcell v. Const., Inc. v. Welch, 17 S.W.3d 398, 403 (Tex.App.--Houston [1st Dist.]
2000, no pet.). We review a court's refusal to offset prejudgment interest under an abuse
of discretion standard. Helena Chemical Co. v. Wilkins, 18 S.W.3d 744, 760 (Tex. App.--
San Antonio 2000), aff'd, 47 S.W.3d 486 (Tex. 2001); City of Alamo v. Casas, 960 S.W.2d
240, 260 (Tex.App.--Corpus Christi 1997, pet. denied). 

 Appellants argue that the court should have granted an offset from appellees first
request for continuance on October 1, 1998, to the date of the fifth trial setting when the
case actually went to trial on May 7, 2001. They base this contention on their claim that
appellees did not promptly pursue a speedy resolution of their claims by requesting at
least four continuances. 

 While this case took almost five years to come to trial, the clerk's record reveals
only three motions for continuance by appellees and only one of those motions was
opposed by appellants. If appellants felt that appellees were unnecessarily delaying the
trial, they could have been more proactive in seeking and holding appellees to a trial
setting. It has been held not to be an abuse of discretion to refuse to make an offset
against prejudgment interest when one motion for continuance was granted at one party's
request, another motion for continuance was granted at the other party's request, and one
was granted pursuant to a joint motion. Aquila Southwest Pipeline, Inc. v. Harmony
Exploration, Inc., 48 S.W.3d 225, 244 (Tex.App.--San Antonio 2001, pet. denied). Under
the record before us, we cannot say the trial court abused its discretion in refusing to offset
prejudgment interest. In summary, we sustained in part and overruled in part appellants'
first issue. In doing so, we found that the judgment should be calculated based on a single
statutory cap adjusted by the consumer price index and that prejudgment interest should
be calculated on the award of survival damages only. We also overrule appellees' cross-issues. 

 In their second issue, appellants argue that the judgment improperly included
Denise Corbello and Lynette Calvert, as heirs at law of the Estate of Wanda Granger
because they non-suited their claims with prejudice against appellants prior to trial. 
Appellees respond that Corbello and Calvert only non-suited their individual claims against
appellants, not their survival claims. Thus, they assert, because the judgment only awards
them damages as heirs at law, the judgment does not include improper plaintiffs. 

 Corbello and Calvert sued both on an individual basis and as heirs at law of
Granger's estate. The notice of non-suit was brought by them only in their individual
capacities. Further, it specifically states that the non-suit "is only being taken as to
individual claims made on the part of DENISE CORBELLO AND LYNETTE CALVERT and
not as to any claims made by the Estate of Wanda Granger." 

 Appellants appear to contend that because Corbello and Calvert did not appear at
trial and no claims were submitted by them in the charge to the jury, the judgment is in
error. However, the jury was asked what sum of money would fairly and reasonably
compensate Granger for pain and mental anguish. This question represents the claim for
survival damages which is the claim brought by Granger's estate. Because the claims of
Corbello and Calvert, as heirs at law of Granger's estate were not non-suited, this question
represents their claims. Appellants' second issue is overruled.

 By way of their third issue, appellants contend that the trial court erred in awarding
judgment against Cresthaven and the five general partners. Appellants object to the
inclusion of the general partners because no evidence was submitted to support the
liability of the general partners and the jury made no finding of liability for them. We have
already discussed this issue with respect to whether there should be a single cap on
damages. It was because there was no assertion or finding of liability against the partners
independent of their status as general partners that we concluded that a single cap should
apply. However, we also concluded that it was appropriate to include the general partners
in the judgment because, under the law, they have joint and several liability for the debts
of the partnership. 

 Appellants argue that, in the last live pleading by appellees, they only alleged that
"the corporate partners were responsible for the management and operation of Cresthaven
Nursing Residence, that each of the corporate partners were general partners of Cantex
Healthcare Centers, and that the corporate partners were jointly and severally liable for
the acts and omissions of the employees of Cresthaven." Appellants now appear to be
arguing that these allegations are asserting claims against the general partners arising
under the law independent of their status as general partners and, because they filed a
verified denial of these allegations and no evidence of negligence of the general partners
was submitted at trial, they are improperly included in the judgment. 

 As already stated, we interpret these allegations as asserting a claim against the
general partners based only on their status as general partners, which we believe is
supported by the fact that no evidence was introduced at trial as to their individual
negligence and no issue submitted to the jury with respect to any such negligence. Even
if the allegations included independent individual liability for which no findings were made
by the jury, those facts would not obviate the statutory mandate which holds the general
partners liable. The general partners were named as parties to the lawsuit and, under the
law, they are jointly and severally liable for the debt owed under the judgment by Cantex. 
Thus, it is appropriate to include them in the judgment. 

 Appellants have failed to present any argument or authorities as to why Cresthaven
should not be included in the judgment. Therefore, nothing is presented for review. (4)
Dunlap v. Excel Corp., 30 S.W.3d 427, 434 (Tex.App.--Amarillo 2000, no pet.); Jefferson
County Drainage Dist. No. 6 v. Lower Neches Valley Authority, 876 S.W.2d 940, 953 (Tex.
App.--Beaumont 1994, writ denied). We overrule appellants' third issue. 

 In their fourth issue, appellants complain of the trial court's error in submitting a
spoliation instruction to the jury, which probably caused the rendition of an improper
judgment. The instruction given by the court was as follows:

 You are instructed that, when a party has possession of a piece of
evidence at a time he knows or should have known it will be evidence in a
controversy, and thereafter he disposes of it, alters it, makes it unavailable,
or fails to produce it, there is a presumption in law that the piece of evidence,
had it been produced, would have been unfavorable to the party who did not
produce it. If you find by a preponderance of the evidence that Cresthaven
Nursing Residence had possession of original, unaltered nurses notes
pertaining to Wanda Granger at a time it knew or should have known they
would be evidence in this controversy, then there is a presumption that the
original, unaltered nurses notes pertaining to Wanda Granger, if produced,
would be unfavorable to Cresthaven Nursing Residence. This presumption
may be rebutted by Cresthaven Nursing Residence with the evidence of a
reasonable explanation for the non-production of the evidence. (5) 


 The doctrine of spoliation refers to the improper intentional destruction of evidence
relevant to a case. See Malone v. Foster, 956 S.W.2d 573, 577 (Tex.App.--Dallas 1997),
aff'd, 977 S.W.2d 562 (Tex. 1998). Trial courts have broad discretion to take measures
to correct the ill effects resulting from spoliation, including a jury instruction on the
spoliation presumption and death penalty sanctions. Trevino v. Ortega, 969 S.W.2d 950,
953 (Tex. 1998). In making that determination, appellants urge reliance on the factors set
forth in Justice Baker's concurring opinion in Trevino, which are (1) whether there was a
duty to preserve evidence, (2) whether the alleged spoliator negligently or intentionally
spoliated evidence, and (3) whether the spoliation prejudiced the nonspoliator's ability to
present its case. Id. at 954-55. Several courts have adopted these factors in their
analysis of the propriety of an instruction. See Whiteside v. Watson, 12 S.W.3d 614, 621-22 (Tex. App.--Eastland 2000, pet. denied); Offshore Pipelines, Inc. v. Schooley, 984
S.W.2d 654, 667-78 (Tex.App.--Houston [1st Dist.] 1998, no pet.). 

 A party may have a statutory, regulatory or ethical duty to preserve evidence. 
Trevino, 969 S.W.2d at 955. A party also has a duty to preserve relevant evidence once
litigation arises, and a duty to exercise reasonable care to preserve relevant evidence if
it actually or reasonably should anticipate litigation. See Wal-Mart Stores, Inc. v. Johnson,
39 S.W.3d 729, 730, 732 (Tex.App.--Beaumont 2001, pet. granted). 

 The evidence shows that Granger had been a resident of the nursing home since
February 1995. On July 5, 1996, she was admitted to the hospital with a broken femur. 
She returned to Cresthaven on July 8, 1996, but was readmitted to the hospital on July 19
after vomiting dried blood. She died the next day. On July 20, just hours prior to the death
of her mother, Freeman visited the nursing home seeking information as to her mother's
condition in the days prior to her hospitalization and requested a copy of her mother's
records. From this evidence, the trial court could have concluded that there was a duty
on the part of Cresthaven to preserve those records.

 The evidence further shows that on July 20, one of the nurses, Gloria Thompson,
was asked by Joan Adams, the assistant director of nursing, to recopy a July 19 entry in
her nursing notes with respect to Granger. The original note was apparently given to
Adams, but was not available at trial. However, Thompson testified that she recopied her
note verbatim and there is no evidence to the contrary. (6) She additionally stated that
everything in the note was accurate and based on her personal observations. 

 Late entries were also made in the records of Granger although they were not noted
as such. There is some evidence that Adams may have told Thompson and Cynthia
Arceneaux that the chart was not completely documented and information needed to be
filled in. However, none of the persons making those entries testified that they provided
false information. (7) There was also testimony that there were times when the staff was so
busy with resident care that they did not have time to complete their records on their shift
and completed them later. 

 In addition to these acts, appellees claim that they established that (1) medical
records are missing notes from the charge nurse for several shifts during a critical period
of Granger's care, (2) intake/outflow records for the entire month of July are missing, (3)
nurses were directed to fill in missing portions of the medical record, and (4) catheter care
was given by a medication aide who could not give catheter care. However, the pages
cited in the record with respect to the missing notes from the nurse only establish that one
nurse, Maridel Potato Meja, and Thompson herself did not know where Thompson's notes 
were, if she had in fact worked on July 16. It does not prove that the notes ever existed
or that either person was responsible for being the custodian of those records. Further,
the evidence shows that intake/outflow sheets were not placed by Granger's bed, which
is evidence that the documents never existed. 

 Entries in the records for July 12 through July 19 show that Granger was eating
100% of her food, although nurse's aide Essex testified she was not eating much, if
anything. Freeman also stated that, although records indicate that her mother was talking
and asking for food that week, from her own personal observations her mother was not
responding to questions or eating. It is not established if these inconsistencies are the
result of false records or if there are other explanations such as differences in the time of
observation. There is also evidence that entries in care were initially made for one or more
days when Granger was in the hospital, although some of these were later scratched out. 
Once again, the record does not affirmatively establish if these incorrect records are the
result of deliberate falsification or honest mistakes. As to catheter care, Arceneaux denied
that the initials which looked like "C. A." next to catheter care were hers, and no
explanation for who performed the catheter care was provided. 

 Kenneth Blanda, administrator of Cresthaven, testified that he had not been aware
at the time it happened that any entries had been made late or recopied. Further, there
was no directive from upper managment, he averred, for them to "get those records
straight" or make sure there were no blanks in the record. He denied that the records had
been falsified and stated that as far as he knew, they were accurate. However, he
admitted that a notation should have been made of any late entry. 

 The deliberate spoliation of evidence relevant to a case raises the presumption that
the evidence would have been unfavorable to the cause of the spoliator. Ordonez v. M.
W. McCurdy & Co., Inc., 984 S.W.2d 264, 273 (Tex.App.--Houston [1st Dist.] 1998, no
pet.); Wal-Mart Stores, Inc. v. Middleton, 982 S.W.2d 468, 470 (Tex.App.--San Antonio
1998, pet. denied); Brewer v. Dowling, 862 S.W.2d 156, 159 (Tex. App.--Fort Worth 1993,
writ denied). The presumption may be rebutted with a showing that the evidence was not
destroyed with a fraudulent intent or purpose. Hight v. Dublin Veterinary Clinic, 22 S.W.3d
614, 619 (Tex.App.--Eastland 2000, pet. denied). The presumption does not apply when
documents are merely lost. Williford Energy Co. v. Submergible Cable Services, Inc., 895
S.W.2d 379, 389-90 (Tex.App.--Amarillo 1994, no pet.). 

 A trial court must submit in the charge to the jury all questions, instructions, and
definitions raised by the pleadings and the evidence. Hyundai Motor Co. v. Rodriguez ex
rel. Rodgriguez, 995 S.W.2d 661, 663 (Tex. 1999). If the instruction might aid the jury in
answering the issues presented or if there is any support in the evidence for the
instruction, it is proper. Knighten v. Louisiana Pacific Corp., 946 S.W.2d 638, 643
(Tex.App.--Beaumont 1997), rev'd on other grounds, 976 S.W.2d 674 (Tex. 1998).

 We will assume that the purported alteration of records can satisfy the requirement
of destroyed evidence. However, the evidence with respect to the rewriting of Thompson's
nurse's notes for July 19 does not show that there was any false information or that any
prejudice resulted to appellees as a result of the rewriting of those notes. The same is true
with respect to any late entries made to the nursing home records except for the
inconsistent testimony of Essex as to whether she was asked to make late entries for any
days that she did not actually work. Further, the evidence as to the intake/outflow records
is that they never existed, which may be evidence of negligent care, but not of spoliation
of evidence. 

 Thus, the only evidence that might raise the issue of spoliation is the inconsistent
testimony of Essex as to whether she was asked to make late entries for days that she did
not actually work, inconsistencies between nurse's records showing the patient was eating
and talking in the days before her death and the testimony of a nurse's aide and the
patient's daughter which stated she was not, and Thompson's notes for July 16, which may
be missing but were not shown conclusively to have actually existed. Although not
particularly strong, these facts rise to a scintilla of evidence which would support the giving
of the instruction within the discretion afforded to the trial judge. Further, if the medical
records were altered to show that the patient was eating and talking in the days before her
death when, in fact, she was not, that information could have constituted some evidence
that the nursing home was aware she had a bladder infection which continued to worsen,
thereby resulting in her death, according to appellees' theory of the case. Appellants'
fourth issue is overruled.

 In their fifth and sixth issues, appellants claim the damages awarded arising out of
both the survival claim and wrongful death claim are excessive and not supported by
factually sufficient evidence. Therefore, they assert, they are entitled to a new trial or,
alternatively, this court should suggest a remittitur of damages. 

 In determining whether damages are excessive, the court should use the same test
as that for a factual sufficiency question. Pope v. Moore, 711 S.W.2d 622, 624 (Tex.
1986). Thus, we must consider and weigh all of the evidence and should set aside the
award only if the challenged finding of fact is so contrary to the overwhelming weight of the
evidence as to be manifestly unjust. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660,
661-62 (1951). The mere fact that an award is large does not show that the jury was
influenced by passion, prejudice, sympathy, or other circumstances not in evidence, and
the award must be flagrantly outrageous, extravagant, and so excessive that it shocks the
judicial conscience. Missouri Pacific R. Co. v. Roberson, 25 S.W.3d 251, 257-58 (Tex.
App.--Beaumont 2000, no pet.).

 The jury was asked what sum of money would have fairly and reasonably
compensated Granger for pain and mental anguish, which was defined as the conscious
physical pain and emotional pain, torment, and suffering experienced by her before her
death as a result of the occurrence in question. The jury found that $4.5 million would so
compensate her. 

 In Saenz v. Fidelity & Guaranty Ins. Underwriters, 925 S.W.2d 607 (Tex. 1996), it
was held that mental anguish must be "a high degree of mental pain and distress" and
must necessarily involve more than mere worry, anxiety, vexation, embarrassment, or
anger. Id. at 614. While juries must be afforded discretion in arriving at the determination
of a figure for which there is no exact evaluation, there must be some evidence to justify
the amount awarded, and juries cannot simply pick a number. Id.

 At the time of her admission to the nursing home, Granger suffered from Alzheimer's
Disease, organic brain syndrome, decreased functional activity, diabetes, hypertension,
and urinary tract infections. During the time relevant to this lawsuit, there was testimony
that Granger suffered from pain as a result of a broken leg on July 4, 1996, prior to her
death on July 20, 1996. This apparently occurred as a result of two employees attempting
to move her to her bed when she fell, collapsed or was dropped. (8) The nursing home
records show that immediately after her fall, Granger was asked if she had any problems,
and she replied negatively. However, the pain from the broken leg was described by her
daughter as "excruciating," in spite of pain medication. The pain would be exacerbated
by being moved by nursing home personnel, although Freeman also complained that her
mother was in pain because she would be left in one position too long. There is further
evidence that Granger may have been despondent, lacking an appetite, and producing
cloudy and unpleasant smelling urine through her catheter during this time period,
although Freeman stated that she did not notice any foul odors when she visited. 
Additionally, there was some testimony from Freeman that, at one time when she asked
the staff to clean up her mother, it was discovered that her mother was lying in caked
feces. Further, she was vomiting on July 19 prior to her admission to the hospital. After
she had been admitted to the hospital on July 19, her daughter described her as shaking
and non-responsive, although hospital records described her as alert, awake, not running
a temperature, and having no speech problem. However, her condition worsened within
hours after admission to the hospital, and she died, according to appellees, from sepsis
occurring as a result of an untreated bladder infection. Nevertheless, appellants
presented autopsy evidence that her death was the result of coronary artery sclerosis due
to a pinpoint narrowing of one of her arteries. 

 In examining the excessiveness of the damages awarded, the holdings in two cases
out of the same court provide some guidance. In Casteel v. Crown Life Ins. Co., 3 S.W.3d
582 (Tex.App.--Austin 1997), rev'd in part on other grounds, 22 S.W.3d 378 (Tex. 2000),
the plaintiff was awarded $6,000,000 for past mental anguish as a result of his claim for
damages resulting from a misrepresentation of an insurance agent that the obligation to
pay premiums under a policy would eventually vanish. The plaintiff testified that he lost
business, friends, and his reputation due to the dispute, he required psychiatric treatment
and medications due to stress, he suffered short and long term memory loss, and he had
attempted suicide due to depression. His wife also testified about the effect of the dispute
on his life. However, the court found that although the evidence supported a finding that
he suffered from past mental anguish, nothing in the record showed that $6,000,000 was
reasonable compensation for that anguish. Id. at 593. 

 In Rehabilitation Facility at Austin, Inc. v. Cooper, 962 S.W.2d 151 (Tex.App.--Austin
1998, no pet.), a 71-year-old woman suffering from rheumatoid arthritis and osteoporosis
was being moved from a wheelchair to her hospital bed when she experienced great pain,
became nauseous, and blacked out. It was discovered several hours later that two bones
had been broken in her right leg. The next day, after further complaints of pain, it was
discovered that two bones in her left leg were also broken. She spent two months in full
leg casts. Although she had not been able to walk prior to the incident, after the incident
she was unable to stand even with a walker and could not sit for more than 20 minutes at
a time. The rest of the time she was prone and could no longer enjoy car rides with her
son. She experienced pain at the fracture sites and became depressed. There was also
testimony that her chances of living as long as she might have were decreased. In finding
that she had been deprived of what little hope and independence she had, the court held
that the evidence supported an award of $1,235,000 for pain, mental anguish and physical
impairment alone. Id. at 155. 

 Although there is evidence that Granger suffered pain between July 4 and July 20
as a result of breaking a bone in her leg, she may have been depressed, lacking an
appetite, and may not have been timely washed after having defecated in her bed on one
occasion, there is nothing in the evidence to support an award of $4.5 million. There is no
evidence that, if indeed she was producing abnormal urine in the days preceding her
death, she was even aware of that fact or that it caused her worry or pain. Further,
because such a short time occurred between the incident where her leg was broken and
her sudden deterioration and death, there is no evidence as to how the broken leg might
have affected her long term physical and mental prognosis. We do not believe the record
supports an award of $4.5 million for Granger's physical pain and mental anguish. We
therefore suggest a remittitur in the amount of $3.5 million in that regard. Having
sustained appellants' fifth issue to that extent, if a remittitur is not voluntarily filed, then a
new trial should be granted. 

 The jury was also asked what sum of money would fairly and reasonably
compensate Freeman for her damages, if any, resulting from the death of her mother. In
making that decision, the jury was instructed to consider loss of companionship and
society, meaning the loss of positive benefits flowing from the love, comfort,
companionship, and society that she would have received from her mother if she had lived,
and mental anguish, meaning the emotional pain, torment, and suffering experienced by
Freeman because of the death of her mother. The jury was allowed to consider the
relationship between Freeman and her mother, their living arrangements, any extended
absences from one another, the harmony of their relations, and their common interests and
activities. The jury awarded $4.5 million, the same amount awarded as survival damages.

 Freeman offered the following testimony with respect to her feelings on the death
of her mother:

 A. It was horrible. I was shocked, hurt, saddened. My kids were all upset. 
You know, we loved my mama a whole lot; and she loved us.


 Q. Did it come too quickly for you, ma'am?


 A. Of course. I never dreamed, never, that my mother would go in a hospital
on a Friday and be dead on a Saturday.


 Q. Do you feel a loss?


 A. Terribly.


 Q. And on top of that do you feel that you have been misled by this nursing
home?


 A. Totally.


 Q. And let down?


 A. Yes.


 Q. Did you love your mother as much as any child could love a mother?


 A. I loved my mother with all my heart, and my kids loved my mother with all
their hearts.


 Q. You feel like they have taken away years that you otherwise could have
had, such as a Mother's Day yesterday?


 A. Yes. 


 Q. And I'm sorry to be testifying for you, but I'm going to let you tell the jury
something and that is what you feel.


 A. I didn't get to tell her "goodbye."


 (Weeping) My kids didn't get to tell her "goodbye."


 We didn't get to say those things that we needed to say. And we
looked forward to the holidays. We still talk about it. We eat food, and I fix
certain kinds of things my mother liked to eat. They would always say,
"That's grandma's - - you know, "That's what she liked."


 We would bring her food, and my kids enjoyed my mother. And they
told her things that went on with the day. She took lots of time with them. 
And they miss her, and I miss her. And it's like every holiday we miss my
mother. 


 And the way - - and the way she died is just like - - it's horrible. 
Nobody should have had to suffer like that, nobody. And I hope that
nobody's mother or anybody else has to suffer ever what I feel in my heart. 



 There was additional testimony that Granger had suffered from nervous breakdowns
throughout her life and that Freeman and her sister had been raised by others while her
mother was in and out of hospitals. Granger had also been unable to raise a younger half-sister. As an adult, Freeman built a relationship with her mother. Beginning in 1987,
Granger lived in her daughter's home, but Freeman became unable to physically care for
her mother's needs, particularly those related to her catheter, and placed her in the
nursing home in 1995. During her stay at the nursing home, Granger had periods of time
in which her mental status was altered. 

 In Russell v. Ramirez, 949 S.W.2d 480 (Tex.App.--Houston [14th Dist.] 1997, no
writ), the court found an award of $750,000 for mental anguish and loss of the
companionship of the plaintiff's 16-year-old son to be supported by the evidence. Id. at
487. In doing so, the court noted the plaintiff was a single parent and her son had lived
at home at the time of his death, there was evidence that they did a lot of activities
together such as skating, going to the mall, to movies and to Astroworld, there was a
videotape of him dancing with his mother shortly before his death, the plaintiff stayed with
her son at the hospital for 12 days before he died and, even though she was advised he
would not recover, she talked to him and prayed for him, she still goes to his grave two or
three times a week to tell him she misses him, she places a memorial to him in the
newspaper every year, and she testified she has never stopped grieving for him. Id. at
486-87.

 No physical manifestation of mental anguish is necessary in wrongful death cases,
and the issue can be submitted to the jury on the basis of the impact suggested by the
circumstances surrounding the loss. Moore v. Lillebo, 722 S.W.2d 683, 687-88 (Tex.
1986). From the evidence presented, a rational trier of fact could have found that, at the
time of her death, the relationship between Freeman and her mother was close, and they
had lived together happily for eight years until Freeman could no longer care for her
mother who, by the time of her admission to the nursing home, had significant health
problems. However, throughout her life, Freeman and her mother had been separated for
extended periods of time, and there is little or no evidence of common interests or
activities. 

 We believe in this instance the amount of the award is not supported by the
evidence. We therefore sustain appellants' sixth issue and suggest a remittitur of $3
million in that regard. In the event the remittitur is not voluntarily made, the matter will be
reversed for a new trial.

 Appellants complain in their eighth issue that the trial court abused its discretion in
admitting the testimony of appellees' medical expert, Dr. J. D. Britton, because he was not
qualified to render an expert opinion on the issues in this case relating to urology,
cardiology, and pathology. 

 Dr. Britton testified he was a family practitioner for approximately nine years. During
that time, he was a medical director of a nursing home in Austin for almost seven years. 
Then, he moved to Houston and began a residency program in occupational medicine for
two years. He obtained a master's degree in public health and completed his training in
occupational medicine. He has since been in private practice in occupational medicine. 
 Dr. Britton is certified in preventive medicine with occupational medicine as a specialty
and board eligible in family practice, meaning he has not taken the final exam to be
certified. His experience in the areas of urology, cardiology, and pathology are from
medical school and his subsequent internship, as well as having treated patients with
urological and cardiac problems. 

 With respect to the care of Granger, he testified there was evidence that she was
suffering from a bladder infection and that the nursing home staff had failed to give her
antibiotics, even though they had been prescribed, which was negligence. She was known
to have frequent urinary infections, had been treated with antibiotics for over a year and
when the antibiotics ceased, she still had a "smoldering infection." He further stated that
weakness resulting from her infection would have contributed to her fall, resulting in a
broken leg. When Granger was admitted to the hospital with her broken leg, her white cell
count indicated an infection, which was untreated from July 1 through July 20. On
admission to the hospital on July 19, her white cell count also indicated a severe infection. 
In the emergency room on July 19, she was diagnosed with gastrointestinal bleeding, but
later in intensive care, a nurse reported that there was pus coming out of her bladder. 
There were also dark clots of urine which would indicate the urinary tract was bleeding. 


 According to Dr. Britton, this infection entered into Granger's bloodstream and
sepsis resulted in her death. He further opined that sepsis can shut down any vital organ
including the heart, resulting in sudden heart failure. Also, the stress of infection and the
pain of a broken leg could have caused heart failure. The fact that she had no
temperature is not indicative that she had no infection, because the elderly can have
subnormal or normal temperature when they have an infection, and a severe infection can
cause intestinal bleeding. He further stated that as of 11:00 p.m. on July 19, the
information available, including the fact she was elderly with gastrointestinal bleeding, a
white cell count of 27,000, IV fluids needing to be administered, her blood pressure
dropping and increased pulse and respiratory rates, indicated she was septic. By the time
antibiotics were given, it was too late. 

 According to Britton, Granger had three kinds of bacteria that are common in
persons with catheters for a long period of time. The bacteria are easily treated if done
so promptly. If the hospital had received accurate records as to the nature of Granger's
urine, her lack of input and output, and her non-responsiveness prior to admission to the
hospital, proper treatment could have saved her life.

 Dr. Britton found it to be a breach of the standard of care for a nurse to not follow
up on an order for an antibiotic, thereby discontinuing its use and that was a proximate
cause of injury. Further, the nursing home was grossly negligent, in his opinion, in their
awareness of certain problems about which nothing was done, such as having no
intake/outflow records. The failure of the nursing home to communicate Granger's
problems to the hospital was reasonably certain to have caused her death. 

 In a medical malpractice case, the plaintiff must establish a duty requiring the
defendants to conform to a certain standard of conduct, the applicable standard of care
and its breach, a resulting injury, and a reasonably close causal connection between the
breach of the standard of care and the injury. Blan v. Ali, 7 S.W.3d 741, 744 (Tex. App.--
Houston [14th Dist.] 1999, no pet.). Expert testimony is necessary to meet this burden. Id. 
An expert qualified by knowledge, skill, experience, training, or education may testify as
to scientific, technical, or other specialized knowledge if it will assist the trier of fact to
understand the evidence or determine a fact in issue. Tex. R. Evid. 702. 

 However, every licensed doctor is not automatically qualified to testify as an expert
on every medical question. Broders v. Heise, 924 S.W.2d 148, 152 (Tex. 1996). 
Nevertheless, the fact that an expert is not a specialist in the particular branch of medicine
for which the testimony is offered will not automatically disqualify him as an expert. Ali,
7 S.W.3d at 745. The question to be resolved is the specific subject matter and the
expert's familiarity with it. See Heise, 924 S.W.2d at 153; Ali, 7 S.W.3d at 745. The
proponent of the expert bears the burden of showing that the expert's testimony is
qualified, relevant to the issues, based on a reliable foundation, and will assist the trier of
fact. E. I. du Pont de Nemours and Co., Inc. v. Robinson, 923 S.W.2d 549, 556 (Tex.
1995). We review the ruling of the trial court as to the qualifications of an expert witness
under an abuse of discretion standard. Heise, 924 S.W.2d at 151.

 Appellants complain that Dr. Britton was not qualified by education, training,
knowledge, or experience in the fields of urology, cardiology, or pathology, which would
qualify him to make a diagnosis of sepsis or urosepsis or to render opinions that the same
were the proximate cause of Granger's broken leg, heart failure, and/or death. This is
primarily so because his only training or experience in those fields occurred in medical
school or in his practice of family medicine, which ended in 1984. Therefore, his opinions
were mere speculation. 

 The focus of our determination is not on the doctor's area of expertise, but on the
condition involved in the claim. Ali, 7 S.W.3d at 746. If Dr. Britton is offering opinions
peculiar only to the fields of urology, cardiology, and pathology, then he is unqualified to
render them. However, if the standards of care he discusses apply to any physician or
health care provider who treats an elderly patient with long term catheter care and
cardiology problems, then his lack of expertise in those special fields is irrelevant. See id.
at 747. 

 Dr. Britton's opinions as to the negligence of the nursing home involved the failure
to give an antibiotic that had been prescribed for a urinary tract infection, to maintain
accurate information in nursing home records and to communicate that information to
hospital personnel upon transfer of a patient to the hospital. The standard of care with
respect to these actions are common to all patients in a nursing home and, further, Dr.
Britton had experience as a nursing home director. 

 As to the cause of death, Dr. Britton relied on his medical training and general
experience treating patients. He further researched reference articles with respect to
sepsis and the conditions which indicate its manifestation and also an article on
precipitating causes of heart failure. Moreover, one of the consulting hospital physicians
for Granger on June 20, a cardiologist, gave his impression of her condition as
"hypotension and shock, probably secondary to sepsis, probably urosepsis and urinary
tract infection." Additionally, her attending physician at the time of her death, a doctor of
osteopathy, listed one of the causes of death on her death certificate as sepsis. (9) Thus,
there is nothing to indicate that the opinions offered required an expertise peculiar to the
fields of cardiology or urology. Further, multiple doctors who are not pathologists offered
opinions as to the cause of Granger's death. The trial court did not abuse its discretion in
allowing Dr. Britton to testify. Appellants' seventh issue is overruled.

 In their eighth issue, appellants argue that because Dr. Britton's testimony was not
competent, the record contains no evidence to establish the standard of care, breach of
that standard, or proximate causation. However, we have found Dr. Britton's testimony to
have been admissible, and thus there was some evidence on all three elements of
appellees' claims. It was up to the jury to assign whatever credibility they chose to that
testimony. We therefore also overrule appellants' eighth issue. 

 Summarized, we overrule appellants' second, third, fourth, seventh and eighth
issues and appellees' two cross-issues. We sustain in part appellants' first issue by
finding that the damages should be limited to a single statutory cap. Prejudgment interest
is not subject to the cap and should be computed on the amount of survival damages
alone. We also sustain appellants' fifth and sixth issues. If the suggested remittiturs are
not voluntarily made within a period of 45 days from the date of this opinion, this cause will
be reversed and remanded for a new trial. If the remittiturs are made within that time, the
cause will be affirmed.


 John T. Boyd

 Senior Justice 

 

 

 


 


 


 

 

 

 

 

 
1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by
assignment. Tex. Gov't Code Ann. Â§75.002(a)(1) (Vernon Supp. 2003). 
2. The five general partners of Cantex Healthcare Centers are the remaining
appellees, Bratex, Inc., Gamtex, Inc., Medco Medical Services, Ontex, Inc., and Amlon
U.S.A., Inc. 
3. Tex. Rev. Civ. Stat. Ann. art. 5069-1.05, section 6(a) now codified as Tex. Fin.
Code 304.102 (Vernon Supp. 2003).
4. We would tend to agree that it was unnecessary to include Cresthaven in the
judgment. However, because there is no evidence that Cresthaven and Cantex are
separate legal entities, we fail to see any harm in its inclusion in the judgment, and
appellants have not asserted any such harm. 
5. Appellants also complain that the instruction did not assist the jury, but confused
and misled them and improperly shifted the burden of proof. However, in their reply brief,
they clarify that these complaints are raised only to show the harm suffered from the
instruction, not as a direct attack on the instruction itself. 
6. There is no explanation as to why she was asked to recopy that particular note. 
7. Tashia Essex testified at trial that she was asked to fill in information for days she
did not work, but admitted that in her deposition she had testified she was only asked to
fill in information for days that she did work. No explanation for this inconsistency is
provided. 
8. The nursing home records show that Granger had a fainting episode, although
Freeman stated she did not believe that to be true. There is evidence that Granger was 
obese and weighed 295 pounds at the time of admission to the nursing home. 
9. At trial, he changed his opinion of the cause of her death based on the autopsy
report, which found the cause to have been coronary arteriosclerosis. He also stated that
the consulting cardiac physician now believes her death was cardiac-related.